**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CYNTHIA MINAFEE; CONSWEYLA
MINAFEE; and LINDSEY RUDOLPH for
YAHAVEN PYLANT,

        Plaintiffs,

v.                                        No. 1:20-cv-00671-MIS-LF

BERNALILLO COUNTY BOARD OF
COMMISSIONERS, a governmental
entity of the State of New Mexico;
SHERIFF MANUEL GONZALES,
Bernalillo County Sheriff's Department,
individually; DEPUTY SHERIFF
LEONARD ARMIJO of the Bernalillo
County Sheriff's Department, individually;
and DEPUTY SHERIFF PATRICK RAEL
of the Bernalillo County Sheriff's
Department, individually,

        Defendants.

**MEMORANDUM OPINION AND ORDER
GRANTING IN PART AND DENYING IN PART
<u>MOTION FOR SUMMARY JUDGMENT</u>**

THIS MATTER is before the Court on "Motion for Summary Judgment Dismissing

Count I on Basis of Qualified Immunity" ("Motion") [ECF No. 50], filed February 11, 2022,

by Defendants Bernalillo County Board of Commissioners, Sheriff Manuel Gonzales,

Deputy Sheriff Leonard Armijo, and Deputy Sheriff Patrick Rael (collectively

"Defendants"). Plaintiffs Cynthia Minafee, Consweyla Minafee, and Lindsey Rudolph, on

behalf of Yahaven Pylant (collectively, "Plaintiffs"), filed their Response and Amended

Response, and Defendants filed their Reply and Amended Reply. ECF Nos. 57, 59, 63,

75. Defendants seek summary judgment pursuant to Federal Rule of Civil Procedure 56

on Count I of Plaintiffs' Second Amended Complaint [ECF No. 6], which alleges a violation of the Fourth Amendment to the United States Constitution. Having considered the parties' submissions, the record, and the relevant law, the Court will **GRANT IN PART** and **DENY IN PART** the Motion.

## FACTUAL BACKGROUND

This case concerns a traffic stop that occurred on July 7, 2017, on Interstate 40 in New Mexico. The parties dispute the events that took place and provide conflicting evidence; however, a portion of the stop was recorded by the dashboard camera of Defendant Deputy Sheriff Leonard Armijo ("Deputy Armijo") of the Bernalillo County Sheriff's Department's vehicle when he arrived on the scene of the traffic stop. ECF No. 37-1, Exs. A-1, A-2, A-3, A-4, A-5, A-6, A-7. Accordingly, the Court views the facts in the light most favorable to Plaintiffs and, where applicable, in the light depicted by the video evidence. *Scott v. Harris*, 550 U.S. 372, 379–81 (2007). For the purposes of this section, the Court will separately present both parties' versions of events prior to the video evidence and then the events depicted by the video evidence as viewed by the Court.

## I. Plaintiffs' Version of Events Prior to the Dashboard Camera Footage

On July 7, 2017, Plaintiffs Cynthia Minafee ("Cynthia"), Consweyla Minafee ("Conswelya"), and Yahaven Pylant ("Yahaven") were driving from Phoenix, Arizona, to Milwaukee, Wisconsin, where all three passengers lived. ECF No. 63-1 at 2–3 ¶¶ 3–4; 8, ¶¶ 2–4. The vehicle was owned by Consweyla's son, Lebrad Kyle Minafee. *Id.* at 2, ¶ 2; 8, ¶ 2. Cynthia and Consweyla are sisters. *Id.* at 2, ¶ 3; 8, ¶ 2. Yahaven, who was five

years old at the time, was in the care of Cynthia.[1] *Id.* at 2, ¶ 3; 8, ¶ 3. All three Plaintiffs are African American, and Consweyla wore a headscarf during the drive.[2] *Id.* at 3, ¶ 9; 8, ¶ 9.

Cynthia and Consweyla went to Phoenix, Arizona, to visit their mother and to transport Cynthia's belongings from their mother's house to Cynthia's house. *Id.* at 3, ¶ 4; 8, ¶ 4. The vehicle was full of household items, luggage, and clothes in the backseat and trunk. *Id.* at 3, ¶ 5; 8, ¶ 5. Consweyla was the vehicle's driver, while Cynthia was in the front passenger seat. *Id.* at 2–3, ¶¶ 2, 7; 8, ¶ 7. Yahaven was in a car seat in the back passenger side, which was seat-belted by both the vehicle and child car seats. *Id.* at 3, ¶ 8; 8, ¶ 8. He was surrounded by personal belongings and covered by a blanket and pillow as he was asleep most of the drive. *Id.* at 3, ¶ 8; 8, ¶ 8.

At around 7:00 a.m., Plaintiffs were heading eastbound on Interstate 40 in New Mexico. *Id.* at 3, ¶ 10. As Consweyla moved from the middle to the left lane with her window down to pass a semi-truck, she saw Defendant Deputy Sheriff Patrick Rael ("Deputy Rael") of the Bernalillo County Sheriff's Department staring at her from across the highway as he drove westbound. *Id.* at 3, ¶ 10. Deputy Rael was in an unmarked vehicle and did not appear to be a police officer. *Id.* at 4, ¶ 12. She then witnessed Deputy Rael do a "double take" and "[stick] his head out of his window" to stare at her after he

---

[1] However, Lindsey Rudolph is Yahaven's biological mother. ECF No. 6 at 2, ¶ 4.

[2] Plaintiffs state that before they left Arizona, Cynthia warned Consweyla that she should remove the headscarf because an officer may presume she is Muslim and therefore racially or religiously profile her and unlawfully stop the vehicle. *Id.* at 3, ¶ 9; 8–9, ¶ 9. Consweyla did not remove the headscarf. *Id.* at 9, ¶ 9.

had passed. *Id.* at 4, ¶ 11. A cement barrier separated the westbound and eastbound lanes. *Id.*

After passing the semi-truck, Consweyla moved the vehicle back to the middle lane and continued to drive at the speed limit. *Id.* at 4, ¶ 13. However, approximately 20 minutes later, Deputy Rael's vehicle came speeding behind Plaintiffs' vehicle. *Id.* at 5, ¶ 14. Deputy Rael then turned on his emergency lights, and Consweyla immediately pulled over. *Id.* at 5, ¶ 15. When the vehicle was initially pulled over, Cynthia and Yahaven were asleep. *Id.* at 4, ¶ 16. However, when the vehicle stopped, Yahaven woke up and was about to pull the shoulder strap of the vehicle seat seatbelt over his head because he thought they were getting out of the vehicle. *Id.* at 4, ¶ 16. Consweyla told him to leave the vehicle seat seatbelt on. *Id.* at 4, ¶ 16.

Deputy Rael approached the vehicle's front passenger side, and Consweyla rolled down the front passenger side window. *Id.* at 4, ¶ 17. Cynthia, barely awake in the front passenger seat, was disoriented and rolled the window back up. *Id.* at 4, ¶ 17; 9, ¶ 10. Deputy Rael began yelling at Plaintiffs to roll the window back down, and Consweyla immediately complied. *Id.* at 4, ¶ 18; 9, ¶ 10. Cynthia then asked Deputy Rael why they had been pulled over, and he responded that he would not answer her and that he did not have to tell her why. *Id.* at 5, ¶ 19; 9, ¶ 11. Cynthia was irritated and continued to confront Deputy Rael as to the reason for the stop. *Id.* at 9, ¶ 11. Cynthia and Deputy Rael then began arguing. *Id.* at 5, ¶ 20. At some point, Deputy Rael warned Consweyla that he would give her a ticket for Cynthia's attitude. *Id.* at 5, ¶ 25; 9, ¶ 11.

During the argument, Yahaven pulled the shoulder strap of the vehicle seat seatbelt over his head. *Id.* at 5, ¶ 20. The seatbelt connected to the child's car seat was

4

still clicked into place properly, and the car seat was still seat-belted by the vehicle seat itself. *Id.* Yahaven commonly pulls the vehicle seat seatbelt shoulder strap over his head when he believes he is getting out of the vehicle. *Id.* at 9, ¶ 12.

Deputy Rael then advised Plaintiffs that Yahaven was not appropriately seat-belted and that he would give them a ticket. *Id.* at 5, ¶ 20; 9, ¶ 12. Consweyla told Deputy Rael that Yahaven had only just pulled the strap over his head but that he could see that Yahaven was still strapped in. *Id.* at 5, ¶ 21.

Deputy Rael then told Consweyla to exit the vehicle. *Id.* at 5, ¶ 22. He asked Consweyla for her driver's license and registration, which she provided. *Id.* He did not "run" her information and told her to get back into the vehicle. *Id.* at 5, ¶ 22; 9, ¶ 15. Consweyla asked him why he pulled Plaintiffs over and he responded, "routine traffic stop." *Id.* at 5, ¶ 22. Deputy Rael would not tell Plaintiffs the reason for the traffic stop despite being asked numerous times. *Id.* at 5, ¶ 23; 9, ¶ 14.

Deputy Rael then asked Cynthia for her information. *Id.* at 5, ¶ 24; 9, ¶ 15. Cynthia objected, asking why she would have to provide her information on a routine traffic stop if she was the passenger. *Id.* Cynthia stated that she "knew her rights," which appeared to anger Deputy Rael. *Id.*

At that point, Deputy Rael made Cynthia get out of the vehicle. *Id.* at 5, ¶ 25; 9, ¶ 16. After Cynthia exited the vehicle, Deputy Rael said he smelled marijuana on her. *Id.* at 6, ¶ 26; 9, ¶ 16. Cynthia and Consweyla both responded that Cynthia had not smoked marijuana in the vehicle and that there was no marijuana in the vehicle. *Id.* Deputy Rael then asked Consweyla if he could search the vehicle and told her if she said no, he would search it anyways. *Id.* at 6, ¶ 27; 9, ¶ 17. She told him to call her son and ask him for

permission since it was his vehicle. *Id.* Deputy Rael did not call her son, instead saying he had probable cause and would search it. *Id.*

After Deputy Rael wrote the citation for the seatbelt violation, Cynthia did not want to sign it. *Id.* at 6, ¶ 33; 9, ¶ 23. Deputy Rael told her he would take her to jail if she did not sign the citation. *Id.* at 7, ¶ 33; 9, ¶ 23. They argued for about ten minutes, and Cynthia signed the citation because she did not want to go to jail. *Id.*

## II.    Deputy Rael's Version of Events Prior to the Dashboard Camera Footage

On July 7, 2017, Deputy Rael was patrolling Interstate 40 west of Albuquerque, New Mexico. ECF No. 50-1 at 1, ¶ 2. As he passed the vehicle Plaintiffs were driving in, he noticed a minor child in the back passenger side who did not have a proper seatbelt over his body. *Id.* 1, ¶ 3. He then initiated a traffic stop of the vehicle. *Id.* at 1, ¶ 4. Thereafter, he made contact with Cynthia, who was in the front passenger side seat. *Id.* at 2, ¶ 5. Consweyla was in the driver's seat, and Yahaven, the minor child, was in the back passenger side seat. *Id.* After interacting with Cynthia and learning Yahaven was in her care, Deputy Rael began to issue her a ticket for the seatbelt violation. *See id.* at 2, ¶ 6. Cynthia admitted to him that the seatbelt was not correctly in place for Yahaven. *Id.* at 2, ¶ 7. He also noticed the smell of marijuana coming from the vehicle. *Id.* at 2, ¶ 8. Consweyla admitted that there may have been marijuana used in the vehicle. *Id.* at 2, ¶ 10. Deputy Rael then decided the next step would be to deploy his certified dog[3] to further the investigation for possession of an illegal substance. *Id.* at 2, ¶ 8. Deputy Armijo then arrived on the scene to assist, at which point the video footage began. *Id.* at 2, ¶ 11.

---

[3] Deputy Rael's dog on duty, Terri, was qualified and certified through the National Narcotic Detector Dog Association. *Id.* at 2, ¶ 9; 4–8.

### III.     Events As Depicted by the Dashboard Camera Footage

The dashboard camera footage begins with Deputy Armijo driving to and arriving at the scene.[4] ECF No. 37-1, Ex. A-1 at 0:00:01–0:02:25. Deputy Rael's unmarked vehicle had the emergency lights on and was parked behind Plaintiffs' vehicle. *Id.* at 0:02:10–0:02:15. Consweyla was standing alone, without a headscarf, in front of Plaintiffs' vehicle, and Cynthia was standing behind the vehicle with Deputy Rael. *Id.* at 0:02:15–0:02:25; *see also* ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18; ECF No. 50-1 at 2, ¶ 12. Cynthia was holding a clipboard and signing the citation issued by Deputy Rael. ECF No. 37-1, Ex. A-1 at 0:02:15–0:02:25; *see also* ECF No. 63-1 at 7, ¶ 33; 9, ¶ 23. The citation provided that the violation was based on an improper child restraint and noted: "Small child not wearing seatbelt correctly, pass[enger] said he was [her] son."[5] ECF No. 63-1 at 17 (copy of executed traffic citation). Yahaven was still inside the vehicle at that time. ECF No. 37-1, Ex. A-1 at 0:02:15–0:02:25.

Deputy Armijo then exited his vehicle and walked over to Cynthia while she reiterated that Yahaven had been seat-belted properly. *Id.* at 0:02:25–0:02:30. Deputy Armijo and Cynthia began to discuss the citation while Deputy Rael walked over to Consweyla and handed her something. ECF No. 37-1, Ex. A-2 at 0:00:01–0:00:35. Audio of Consweyla and Deputy Rael's conversation was not picked up by the dashboard camera, but Consweyla states that Deputy Rael instructed her to get Yahaven out of the

---

[4] The Court notes that the dashboard camera captured both video and audio, but at times the audio cuts out, is interrupted, or is difficult to hear.

[5] The citation lists the violated statute as "66-7-369," but the Court reasonably interprets this to be a scrivener's error, with the clearly intended statute being New Mexico Statute Annotated § 66-7-396. ECF No. 63-1 at 17.

vehicle. ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18. Consweyla is then seen walking over to the back passenger side and opening the vehicle door while Deputy Rael stands close behind her. ECF No. 37-1, Ex. A-2 at 0:00:36–0:01:25.

Although the inside of Plaintiffs' vehicle was not visible to the dashboard camera, according to Consweyla when she went to get Yahaven out of the vehicle, she showed Deputy Rael that Yahaven was still strapped in and then unclicked the seatbelt connected to the car seat to pull Yahaven out. ECF No. 37-1, Ex. A-2 at 0:00:36–0:01:25; ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18. Again, not directly captured by the dashboard camera, Consweyla states Yahaven started looking for his shoes, and Deputy Rael told Consweyla to hurry and that he would remove him if she could not. ECF No. 37-1, Ex. A-2 at 0:01:20–0:01:35; ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18. Cynthia can be heard saying: "What his shoes got to do with anything? Just let him get out, his socks are fine. That's why I put the socks on." ECF No. 37-1, Ex. A-2 at 0:01:30–0:01:40. Consweyla then lifted Yahaven from the vehicle and placed him on the asphalt without shoes on. ECF No. 37-1, Ex. A-2 at 0:01:28–0:01:37; *see also* ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18.

Yahaven held Consweyla's hand as they walked to the front of Plaintiffs' vehicle, per Deputy Rael's instructions. ECF No. 37-1, Ex. A-2 at 0:01:28–0:01:45. Deputy Rael then requested Deputy Armijo walk Cynthia to the front of Plaintiffs' vehicle. *Id.* at 0:01:40–0:01:50. However, the deputies separated Cynthia from her small child and made her stand a few feet ahead of Yahaven and Consweyla on the busy interstate. *Id.* at 0:02:00–0:02:15. Deputy Armijo then stood with Cynthia as they continued their casual conversation. *Id.* at 0:02:15–0:02:30; *see also* ECF No. 63-1 at 6, ¶ 31; 9, ¶ 21.

While Deputy Armijo and Cynthia continued their discussion, Deputy Rael approached Consweyla, and they had a conversation not picked up by the dashboard camera. ECF No. 37-1, Ex. A-2 at 0:01:58–0:02:08. According to Deputy Rael, he requested the vehicle keys from Consweyla. ECF No. 50-1 at 2, ¶ 13. Consweyla is seen handing the vehicle keys to Deputy Rael. ECF No. 37-1, Ex. A-2 at 0:02:09–0:02:12. Deputy Rael opened the vehicle trunk using the key fob and looked inside the trunk. *Id.* at 0:02:13–0:02:25. Leaving the trunk open, and without taking anything out from inside the trunk, he walked over to the back seat of the driver's side of the vehicle, opened the door, and began rummaging inside the vehicle. *Id.* at 0:02:26–0:02:50. He then closed the vehicle door with a pair of shoes in his hands but left the trunk open. *Id.* at 0:02:51–0:03:05. He handed the shoes to Cynthia and Yahaven, and Yahaven put them on. *Id.* at 0:03:06–0:03:30; *see also* ECF No. 50-1 at 2, ¶ 14.

Deputy Rael then ran his drug-sniffing dog around the vehicle, including near the trunk with the trunk still open and with the dog partially entering the interior of the trunk. ECF No. 37-1, Ex. A-2 at 0:04:10–0:05:28; ECF No. 37-1, Ex. A-3 at 0:00:01–0:00:03; *see also* ECF No. 50-1 at 2, ¶ 14; ECF No. 63-1 at 6, ¶ 29; 9, ¶ 19. The dog alerted to the odor of contraband in the vehicle near the trunk. ECF No. 37-1, Ex. A-4 at 0:00:55–0:01:10; *see also* ECF No. 50-1 at 2, ¶ 15. Deputy Rael then meticulously went through the trunk's contents, putting the items on the asphalt and then back into the trunk. ECF No. 37-1, Ex. A-3 at 0:00:40–0:05:28; ECF No. 37-1, Ex. A-4 at 0:00:01–0:02:50; *see also* ECF No. 50-1 at 2, ¶ 16. He then opened the back driver's side door and searched through the vehicle, again taking items out of it and putting them on the asphalt. ECF No. 37-1,

Ex. A-4 at 0:02:51–0:05:28; ECF No. 37-1, Ex. A-5 at 0:0:01–0:00:30; *see also* ECF No. 50-1 at 2, ¶ 16.

While Deputy Rael conducted the search, Deputy Armijo stood with Cynthia and continued their casual conversation. ECF No. 37-1, Ex. A-4 at 0:00:1–0:05:28; ECF No. 37-1, Ex. A-4 at 0:00:01–0:04:05. During their conversation, Cynthia admitted that she smokes marijuana "every now and then." ECF No. 37-1, Ex. A-4 at 0:01:10–0:01:15. And when Deputy Armijo stated, "So probably what the dog alerted to is the odor or residue of weed, if — if you did smoke it," Cynthia replied, "Yeah, it was some blunt roaches."[6] *Id.* at 0:03:10–0:03:18; *see also* ECF No. 50-1 at 2, ¶ 17. Deputy Armijo eventually ended his conversation with Cynthia and joined Deputy Rael to complete the search more quickly. ECF No. 37-1, Ex. A-4 at 0:05:15–0:05:28.

Deputy Rael and Deputy Armijo searched the vehicle together as Cynthia, Consweyla, and Yahaven remained in front of their vehicle. ECF No. 37-1, Ex. A-5 at 0:00:30–0:05:28; ECF No. 37-1, Ex. A-6 at 0:00:01–0:04:20. During the search of the interior of the vehicle, Deputy Rael stated to Deputy Armijo: "I can — I can't smell it. I can only smell it coming from that side over there." ECF No. 37-1, Ex. A-5 at 0:03:45–0:03:55. Later, during this same search, Deputy Armijo stated to Deputy Rael: "Yeah, but there's — they're smoking in here, but they all smell just like regular Swisher Sweets. She said

---

[6] A "blunt" is "an unrolled cigar with the tobacco taken out of the middle and then refilled with marijuana." *United States v. Timley*, 338 F. App'x 782, 785 (10th Cir. 2009). And a "roach" is "expended marijuana cigarette" or blunt. *United States v. Anderson*, 468 F.2d 1280, 1282 (10th Cir. 1972).

she smoked it before, like earlier, is what she told me, but . . . ."[7] ECF No. 37-1, Ex. A-6 at 0:00:59–0:01:10.

Ultimately, Deputy Rael and Armijo could not find contraband and ended the search. ECF No. 37-1, Ex. A-6 at 0:04:21–0:04:40; *see also* ECF No. 50-1 at 2, ¶ 18. The investigatory detention of Consweyla, Cynthia, and Yahaven was terminated, and they were allowed to return to their vehicle and leave. ECF No. 37-1, Ex. A-6 at 0:04:41– 0:05:29; ECF No. 37-1, Ex. A-7 at 0:00:01–0:00:41; *see also* ECF No. 50-1 at 2, ¶ 18.

## PROCEDURAL BACKGROUND

Plaintiffs filed this action asserting several state and federal law claims, including a 42 U.S.C. § 1983 ("Section 1983") claim for unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution (Count I). ECF No. 6 at 15–16. On February 11, 2022, Defendants filed the underlying Motion seeking summary judgment on Plaintiffs' Fourth Amendment claim (Count I) pursuant to Federal Rule of Civil Procedure ("Rule") 56 based on qualified immunity. ECF No. 50.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment is appropriate where the pleadings, discovery materials, and affidavits or declarations show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which

---

[7] Swisher Sweets is a brand that produces and sells cigars and cigarillos. *See United States v. Villasenor Gutierrez*, No. 2:07-CR-091, 2007 WL 4053250, at *2 (D. Utah Nov. 13, 2007).

it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the non-movant must put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–52 (1986). A fact is "material" if, under the substantive law, it is essential to the proper disposition of the claim. *Id.* at 248. And a dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party. *Id.*

The non-moving party cannot rely upon conclusory allegations or contentions of counsel to defeat summary judgment. *See Pueblo Neighborhood Health Ctrs., Inc. v. Losavio*, 847 F.2d 642, 649 (10th Cir. 1988). Rather, the non-movant has a responsibility to "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [their] case in order to survive summary judgment." *Johnson v. Mullin*, 422 F.3d 1184, 1187 (10th Cir. 2005) (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998)).

It is not a court's role to weigh the evidence or assess the credibility of witnesses in ruling on a motion for summary judgment. *Daniels v. United Parcel Serv., Inc.*, 701 F.3d 620, 627 (10th Cir. 2012). Rather, the court resolves all doubts against the movant, construes all admissible evidence in the light most favorable to the non-movant, and draws all reasonable inferences in favor of the non-movant. *See Hunt v. Cromartie*, 526 U.S. 541, 551–52 (1999); *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

## II.   Qualified Immunity

Additional steps are taken when a summary judgment motion raises a qualified immunity defense. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). The Civil

Rights Act of 1871, codified at 42 U.S.C. § 1983, provides in relevant part that "[e]very person who, under color of any statute . . . of any State . . . subjects . . . any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." Thus, Section 1983 creates a federal cause of action for damages to vindicate alleged violations of federal law committed by individuals acting "under color of state law." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). The statute "creates no substantive civil rights, only a procedural mechanism for enforcing them." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir. 1995). "In defending against § 1983 claims . . . an official may plead an affirmative defense of qualified immunity." *Maresca v. Bernalillo Cty.*, 804 F.3d 1301, 1307 (10th Cir. 2015).

"The doctrine of qualified immunity shields officials [sued in their individual capacities] from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). In other words, it protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

When a defendant asserts qualified immunity at the summary judgment stage, the court "must grant qualified immunity *unless* the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Estate of Booker v. Gomez*, 745 F.3d 405, 411 (10th Cir. 2014) (emphasis added). The court may address these two inquiries in any order. *Pearson*, 555 U.S. at 236. In determining whether a plaintiff has satisfied this burden, the court must "view the facts and draw reasonable inferences in the light

most favorable to the party opposing the summary judgment motion," which, in qualified immunity cases, "usually means adopting . . . the plaintiff's version of the facts" unless that version "is so utterly discredited by the record that no reasonable jury could have believed [them]." *Scott*, 550 U.S. at 378, 380 (internal quotation marks and brackets omitted).

### III.   Clearly Established Law

A right is clearly established when, at the time of the challenged conduct, "the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that [they were] violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). A plaintiff can demonstrate that a right is clearly established in three ways. First, a "materially similar" published case from the Supreme Court or Tenth Circuit[8] may give an official fair notice that their specific conduct would violate a constitutional right. *Apodaca v. Raemisch*, 864 F.3d 1071, 1076 (10th Cir. 2017). Second, the plaintiff can show the existence of a broader, clearly established principle that should control the novel facts in this situation. *A.M. v. Holmes*, 830 F.3d 1123, 1135–36 (10th Cir. 2016). In other words, even if there is no "case directly on point," a body of relevant case law may provide fair warning of unlawful conduct. *Mullenix*, 577 U.S. at 12; (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per

---

[8] The Court is concerned about this requirement as it affords greater civil rights protections to individuals harmed in more populous circuits, like those that encompass the West and East Coasts. Compared to the other Federal Circuits, the Tenth Circuit has one of the smallest populations and one of the lowest civil caseloads. *See Federal Judicial Caseload Statistics 2022 Tables*, U.S. Courts (Mar. 31, 2022), https://www.uscourts.gov/federal-judicial-caseload-statistics-2022-tables. Because there are fewer published opinions regarding Section 1983 in the Tenth Circuit comparatively, individuals in more rural circuits—such as those residing within the Tenth Circuit—have fewer established civil rights than those in more populated circuits.

curiam). Finally, there can be the rare case where the conduct in question has not previously been held unlawful, but an official may still have notice that their conduct violates a constitutional right with obvious clarity. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

## DISCUSSION

### I.   Plaintiffs' Fourth Amendment Claims.

Plaintiffs allege Defendants violated their Fourth Amendment rights at each step of the traffic stop. ECF No. 6 at 15–16. The Court evaluates encounters such as the one at issue "in a step-by-step manner because what may begin as a routine traffic stop will often escalate into probable cause for a search or a search pursuant to a consensual encounter." *United States v. Lee*, 73 F.3d 1034, 1038 (10th Cir. 1996). The Court must "examine each stage of the encounter to ensure that the government had the required amount of reasonable suspicion, probable cause, or consent to support" the challenged police conduct. *Id.* Accordingly, the Court examines the constitutionality of the (i) initial stop, (ii) subsequent investigatory detention, and (iii) searches, in turn, and determines whether summary judgment is appropriate as to each step individually.

### A.   Whether the initial traffic stop by Deputy Rael was justified at its inception.

First, Defendants move for summary judgment on Plaintiffs' Fourth Amendment claim as it relates to the initiation of the traffic stop by Deputy Rael. ECF No. 50 at 6. Defendants argue Deputy Rael did not violate Plaintiffs' clearly established rights when initiating the traffic stop. *Id.* Specifically, Defendants contend Deputy Rael was justified in initiating a traffic stop of Plaintiffs' vehicle based on his reasonable suspicion of a seatbelt

violation. *Id.* Not being able to see a seatbelt on Yahaven, Defendants argue that Deputy Rael reasonably suspected that the child was not properly wearing a seatbelt in violation of New Mexico traffic laws. *Id.* at 6–7 (citing N.M. Stat. Ann. § 66-7-396(C) (1978) ("A child is properly secured in an adult seat belt when the lap belt properly fits across the child's thighs and hips and not the abdomen. The shoulder strap shall cross the center of the child's chest and not the neck, allowing the child to sit all the way back against the vehicle seat with knees bent over the seat edge.")). According to Defendants, it is irrelevant what Deputy Rael's subjective motives may have been in initiating the stop. *Id.* at 7.

Plaintiffs, on the other hand, dispute that Defendant Rael stopped their vehicle for a traffic violation. ECF No. 63 at 9. Rather, Plaintiffs argue that it would have been "logically and physically impossible" for Deputy Rael to have seen Yahaven in the back seat of Plaintiffs' vehicle not seat-belted properly. *Id.* In support, Plaintiffs point out that they were traveling at highway speeds in opposite directions and were separated by a median that only allowed a view of their vehicle for a short period and at a distance. *Id.* Additionally, the back seat of the vehicle was full of household items. *Id.* Plaintiffs contend that Yahaven was adequately secured per the aforementioned traffic statute. *Id.* at 10. According to Plaintiffs, the vehicle was stopped based on illegitimate reasons—namely, because Plaintiffs are African American and Consweyla was perceived as Muslim. ECF No. 63-1 at 7, ¶ 36; 10, ¶ 29. However, Plaintiffs admit that a pillow and blanket obstructed any view of the shoulder strap near Yahaven's chest. ECF No. 63 at 10.

Viewing the facts in the light most favorable to Plaintiffs, the Court determines Plaintiffs have not met their burden to demonstrate a genuine dispute of material fact as

to whether Deputy Rael observed Yahaven not properly wearing a seatbelt. Plaintiffs'
declarations utterly fail to state facts affirming that Deputy Rael was unable to see the
alleged violation. For example, Plaintiffs' declarations do not state that Deputy Rael could
not have viewed the back passenger side of the vehicle or even that it would have been
difficult to view the back passenger side from the angle he was driving. Instead, Plaintiffs'
evidence is consistent with Deputy Rael's account that he could view Yahaven. For
example, although Plaintiffs and Deputy Rael passed each other on the highway,
Consweyla admitted she could view Deputy Rael long and clearly enough herself to see
that he was staring at her and witness him do a double take and stick his head out of the
window to look at her. ECF No. 63-1 at 3–4, ¶¶ 10–11. Further, Plaintiffs admit that a
pillow and blanket obstructed the ability to view whether Yahaven was properly seat-
belted. ECF No. 63 at 10.

Consequently, the Court analyzes whether Deputy Rael's initial traffic stop of
Plaintiffs was justified at its inception based on his observation that Yahaven was not
properly wearing a seatbelt.

### 1. Applicable Law

The Fourth Amendment to the United States Constitution provides that the
government shall not violate "[t]he right of the people to be secure in their persons,
houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S.
Const. amend. IV. The Fourth Amendment applies against the states through the
incorporation doctrine of the Due Process Clause of the Fourteenth Amendment. *Mapp
v. Ohio*, 367 U.S. 643, 655 (1961).

A "seizure" for the purposes of the Fourth Amendment occurs when a government actor terminates one's freedom of movement through means intentionally applied. *Brower v. County of Inyo*, 489 U.S. 593, 596–97 (1989). Thus, a traffic stop is a seizure within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979). "For the duration of a traffic stop . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers." *Arizona v. Johnson*, 555 U.S. 323, 327 (2009) (quoting *Brendlin v. California*, 551 U.S. 249, 255 (2007)) (internal quotation marks omitted). Accordingly, the driver and passengers have standing to challenge the constitutionality of the initial stop. *Id.* at 332.

A traffic stop is justified at its inception if it is "based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001) (quoting *United States v. Botero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995)). "Although the government bears the burden of proving the reasonableness of an officer's suspicion, reasonable suspicion is not, and is not meant to be, an onerous standard." *United States v. Kitchell*, 653 F.3d 1206, 1219 (10th Cir. 2011) (quoting *United States v. Simpson*, 609 F.3d 1140, 1146, 1153 (10th Cir. 2010)) (internal quotation marks and citations omitted). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Kansas v. Glover*, ––– U.S. –––, 140 S. Ct. 1183, 1187 (2020) (quoting *Prado Navarette v. California*, 572 U.S. 393, 397 (2014)). In determining whether reasonable suspicion existed, the court must look objectively at the totality of the circumstances of

which the officer was aware. *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002). However, an officer's subjective motives are irrelevant to this inquiry. *Whren v. United States*, 517 U.S. 806, 813–14 (1996).

### 2. Analysis

The Court determines that Plaintiffs have not met their burden to establish that a reasonable jury could find facts supporting a violation of Plaintiffs' Fourth Amendment rights based on the initiation of the traffic stop by Deputy Rael. Rather, the facts presented demonstrate the traffic stop was justified at its inception. The Court does not discount Plaintiffs' assertions that Yahaven was seat-belted correctly by both the vehicle and child car seat seatbelts. ECF No. 63-1 at 3, ¶ 8; 8, ¶ 8. However, Plaintiffs admit Yahaven was covered with a pillow and blanket, which obscured a view of whether he was appropriately seat-belted at all. Even taking Plaintiffs' version of the facts as true, therefore, Deputy Rael's view of whether Yahaven was properly wearing a seatbelt was obscured. Under New Mexico law, it is a traffic offense if a child is not wearing a seatbelt properly. N.M. Stat. Ann. § 66-7-396(C) (1978). Therefore, Deputy Rael was justified in initiating a traffic stop of Plaintiffs' vehicle based on his reasonable articulable suspicion that such a seatbelt violation was occurring.

Further, the Court is mindful of Plaintiffs' assertions that they were stopped, at least in part, due to their race and perceived religion. Nevertheless, a pretextual traffic stop does not violate the Fourth Amendment so long as the officer has reasonable articulable suspicion to believe a traffic violation has occurred. *Whren*, 517 U.S. at 813–14. It may be that evidence, such as statistical data, is presented to give further credence to such assertions. *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1265 (10th Cir.

2006). But an inquiry into the subjective motivations of Deputy Rael is more appropriately analyzed under a selective enforcement claim pursuant to the Equal Protection Clause of the Fourteenth Amendment than under the Fourth Amendment. *See Wilson v. Dep't of Pub. Safety*, 66 F. App'x 791, 793–94 (10th Cir. 2003); *United States v. Adkins*, 1 F. App'x 850, 851 (10th Cir. 2001).

Accordingly, Deputy Rael is granted qualified immunity as it pertains to initiating the traffic stop as Plaintiffs fail to establish the first prong of the qualified immunity analysis, i.e., a constitutional violation.

### B. Whether Deputy Rael acquired reasonable suspicion to detain Plaintiffs to deploy his drug-sniffing dog.

Next, Defendants move for summary judgment on Plaintiffs' Fourth Amendment claim as it relates to Plaintiffs' continued detention to deploy Deputy Rael's drug-sniffing dog. ECF No. 50 at 7. Defendants argue Deputy Rael did not violate Plaintiffs' clearly established rights in prolonging the traffic stop. *Id.* According to Defendants, Deputy Rael only prolonged the stop's duration after he smelled a marijuana odor emanating from the vehicle when he made contact with Cynthia. *Id.* Further, Defendants contend Deputy Rael only extended the stop for sufficient time to deploy his certified drug-sniffing dog, which occurred in under approximately ten minutes. *Id.*; *see also* ECF No. 37-1, Ex. A-2 at 0:00:01–0:05:28; ECF No. 37-1, Ex. A-3 at 0:00:01–0:00:30.

Plaintiffs contest that Deputy Rael had reasonable suspicion to prolong the traffic stop. *See* ECF No. 63 at 6. Specifically, Plaintiffs refute that Deputy Rael could smell the odor of marijuana emanating from the vehicle or Cynthia. *Id.* In support, Plaintiffs point to the statements made to Deputy Rael by both Cynthia and Consweyla that Cynthia had

not smoked marijuana in the vehicle and that there was no marijuana in the vehicle. *Id.* Additionally, Plaintiffs refer to statements made by Deputy Rael and Deputy Armijo while they were searching the vehicle, including Deputy Rael's comment that "I can — I can't smell it. I can only smell it coming from that side over there," and Deputy Armijo's statement that "Yeah, but there's — they're smoking in here, but they all smell just like regular Swisher Sweets. She said she smoked it before, like earlier, is what she told me, but . . . ." *Id.* at 6–7 (quotes corrected).

Viewing the facts in the light most favorable to Plaintiffs and, where applicable, in the light depicted by the video evidence, the Court determines Plaintiffs have not met their burden to demonstrate a genuine dispute of material fact as to whether Deputy Rael smelled the odor of marijuana emanating from the vehicle. Again, Plaintiffs' declarations utterly fail to directly refute that Deputy Rael could smell marijuana. For example, the declarations do not plainly provide that Plaintiffs themselves could not smell the odor of marijuana or that marijuana had not been smoked in the vehicle.

Indeed, the evidence provided by Plaintiffs does not contradict Deputy Rael's statement that he smelled marijuana. Although Plaintiffs advised Deputy Rael that Cynthia had not smoked marijuana in the vehicle, nor was there marijuana in the vehicle, the dashboard camera footage records Cynthia admitting that she smokes marijuana "every now and then." ECF No. 37-1, Ex. A-4 at 0:01:10–0:01:15. Further, when Deputy Armijo stated, "So probably what the dog alerted to is the odor or residue of weed, if — if you did smoke it," Cynthia replied, "Yeah, it was some blunt roaches." *Id.* at 0:03:10–0:03:18. Additionally, the statements made by Deputy Rael and Deputy Armijo while searching the vehicle's interior only bolster Deputy Rael's contention that he could smell

marijuana emanating from the vehicle because "Swisher Sweets are popular for making marijuana blunts." *Villasenor Gutierrez*, 2007 WL, at *2; *see also* Daniel P. Giovenco, Erin J. Miller Lo, M. Jane Lewis & Cristine D. Delnevo, *"They're Pretty Much Made for Blunts": Product Features That Facilitate Marijuana Use Among Young Adult Cigarillo Users in the United States*, 19 Nicotine & Tobacco Res. 1359 (2017).

Next, the Court analyzes whether Deputy Rael acquired reasonable suspicion to detain Plaintiffs to deploy his drug-sniffing dog based on his observation that he smelled a marijuana odor emanating from the vehicle.

### 1. Applicable Law

An investigatory detention must be temporary, "last[ing] no longer than is necessary to effectuate th[e] purpose" of the stop, which, in the case of a traffic stop, is "to address the traffic violation that warranted the stop" in the first place. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). As part of a routine traffic stop, an officer "may request a driver's license and vehicle registration, run a computer check, and issue a citation." *United States v. Caro*, 248 F.3d 1240, 1244 (10th Cir. 2001). An officer may also generally inquire about the driver's travel plans, *see United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001), ask questions, whether or not related to the purpose of the stop, so long as they do not prolong the stop, *see Simpson*, 609 F.3d at 1146 n.1, or order the passengers out of the vehicle as a precautionary measure, without reasonable suspicion that the passengers pose a safety risk to the officer, *see Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997). But "[o]nce an officer returns the driver's license and registration, the traffic stop has ended and questioning must cease; at that point, the driver must be free to leave." *United*

*States v. Villa*, 589 F.3d 1334, 1339 (10th Cir. 2009). Thus, "[a] seizure that is justified solely by the interest in issuing a [] ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

Nevertheless, a traffic stop may be expanded beyond its initial purpose of issuing a ticket "if the traffic stop has become a consensual encounter" or "if the officer has an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring." *Caro*, 248 F.3d at 1244. Of course, the duration of the subsequent investigatory detention may not extend beyond the reasonable time required to confirm or dispel the officer's reasonable suspicion. *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

### 2.  Analysis

The Court determines that Plaintiffs have not met their burden to establish that a reasonable jury could find facts supporting a violation of Plaintiffs' Fourth Amendment rights based on their continued detention by Deputy Rael to deploy his drug-sniffing dog. Rather, the facts presented demonstrate Deputy Rael acquired reasonable suspicion to prolong the traffic stop beyond its initial purpose of issuing a citation. Once Deputy Rael finished issuing the citation to Cynthia, he was required to let Plaintiffs leave. However, Deputy Rael smelled marijuana emanating from the vehicle when he made contact with Cynthia, and in 2017, possession of marijuana was illegal in New Mexico. N.M. Stat. Ann. § 30-31-23 (2017). Thus, the traffic stop was justifiably prolonged for an appropriate period of time—less than 10 minutes—to deploy Deputy Rael's drug-sniffing dog as he had reasonable suspicion to believe that there may be contraband in the vehicle.

Accordingly, Deputy Rael is granted qualified immunity as it pertains to the continued detention of Plaintiffs to deploy his drug-sniffing dog as Plaintiffs fail to establish the first prong of the qualified immunity analysis, i.e., a constitutional violation.

### C. Whether the search of the interior and trunk of Plaintiffs' vehicle by Deputy Rael prior to the use of the drug-sniffing dog was proper.

Defendants also move for summary judgment on Plaintiffs' Fourth Amendment claim as it pertains to the searches of the interior and trunk of Plaintiffs' vehicle both before and after using the drug-sniffing dog. ECF No. 50 at 7–8. Concerning the first search of the vehicle by Deputy Rael, where he obtained Yahaven's shoes, Defendants contend that Consweyla willingly gave Deputy Rael the keys to the vehicle. ECF No. 75 at 4. According to Defendants, Consweyla only alleges that she told Deputy Rael to ask her son for permission to search the vehicle but made no allegations that she objected to the search. *Id.* As such, Defendants assert that Deputy Rael had consent from Consweyla to search the vehicle to retrieve Yahaven's shoes. *Id.* at 5.

Plaintiffs challenge the constitutionality of the searches of Plaintiffs' vehicle, both prior to and after Deputy Rael conducted a dog sniff around the vehicle. *See* ECF No. 63 at 12. As to the first search, Plaintiffs dispute that Deputy Rael had consent to search by Consweyla. *Id.* at 7–8.

Viewing the facts in the light most favorable to Plaintiffs and, where applicable, in the light depicted by the video evidence, the Court determines Plaintiffs *have* met their burden to demonstrate a genuine dispute of material fact as to whether Deputy Rael had consent to search the interior and trunk of the vehicle prior to the use of the drug-sniffing dog. For example, a reasonable jury could find as follows:

While Plaintiffs were still inside the vehicle, Deputy Rael asked Consweyla if he could search the vehicle and told her if she said no, he would search it anyways. ECF No. 63-1 at 6, ¶ 27; 9, ¶ 17. Consweyla responded by telling Deputy Rael to call her son and ask him for permission to search because he owned the vehicle. *Id.* Deputy Rael did not call her son, instead saying he had probable cause and would search it. *Id.*

Thereafter, Consweyla and Cynthia were separated and required to stand outside on the side of the busy interstate while Yahaven was still inside the vehicle. ECF No. 37-1, Ex. A-1 at 0:02:15–0:02:25; *see also* ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18; ECF No. 50-1 at 2, ¶ 12. At this point, two officers were on the scene, Deputy Rael and Deputy Armijo. ECF No. 37-1, Ex. A-1 at 0:00:01–0:02:25. Deputy Rael then instructed Consweyla to get Yahaven out of the vehicle. ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18. When Consweyla went to get Yahaven out of the vehicle, he started looking for his shoes, and Deputy Rael told Consweyla to hurry and that he would remove him if she could not. ECF No. 37-1, Ex. A-2 at 0:01:20–0:01:35; *see also* ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18. Cynthia can be heard saying: "What his shoes got to do with anything? Just let him get out, his socks are fine. That's why I put the socks on." ECF No. 37-1, Ex. A-2 at 0:01:30–0:01:40. Yahaven was lifted from the vehicle by Consweyla and placed on the asphalt without shoes on. ECF No. 37-1, Ex. A-2 at 0:01:28–0:01:37; *see also* ECF No. 63-1 at 6, ¶ 28; 9, ¶ 18. Yahaven held Consweyla's hand as they walked to the front of Plaintiffs' vehicle, per Deputy Rael's instructions. ECF No. 37-1, Ex. A-2 at 0:01:28–0:01:45.

Deputy Rael then approached Consweyla and requested the keys from her but did not explicitly ask her if he could search the interior and trunk of the vehicle for Yahaven's shoes or any other reason. ECF No. 37-1, Ex. A-2 at 0:01:58–0:02:08; *see also* ECF No.

50-1 at 2, ¶ 13. Consweyla acquiesced to Deputy Rael's command and handed the vehicle keys to Deputy Rael. ECF No. 37-1, Ex. A-2 at 0:02:09–0:02:12. Deputy Rael then opened the vehicle trunk using the key fob and looked inside the trunk. *Id.* at 0:02:13–0:02:25. There was no evident reason to believe that Yahaven's shoes would be in the trunk, mainly as Yahaven was in the back passenger seat and the shoes were searched for near where Yahaven was seated. ECF No. 37-1, Ex. A-2 at 0:01:20–0:01:35. Leaving the trunk open and without taking anything out from inside the trunk, Deputy Rael walked over to the back driver's side of the vehicle, opened the door, and began rummaging inside the vehicle. *Id.* at 0:02:26–0:02:50. He then closed the vehicle door with a pair of shoes in his hands but left the trunk open without apparent explanation. *Id.* at 0:02:51–0:03:05. He then handed the shoes to Cynthia and Yahaven, and Yahaven put them on. *Id.* at 0:03:06–0:03:18; *see also* ECF No. 50-1 at 2, ¶ 14.

As such, the Court analyzes whether the search prior to the use of the drug-sniffing dog is constitutional based on the above-referenced facts.

### 1. Applicable Law

It is well settled that a search conducted without a warrant issued upon probable cause is "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The government conducts a search "when it infringes on a reasonable expectation of privacy." *United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Thus, to establish a Fourth Amendment search, a defendant must show both "a subjective expectation of privacy in the object of the challenged [intrusion]" and that "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo*, 476 U.S. 207,

211 (1986). An individual's privacy interest in their vehicle, including a borrowed vehicle, is constitutionally protected. *Romo v. Champion*, 46 F.3d 1013, 1017 (10th Cir. 1995); *United States v. Valdez Hocker*, 333 F.3d 1206, 1210–11 (10th Cir. 2003). "[T]his protection clearly extends to a car's trunk." *Romo*, 46 F.3d at 1017. It is, therefore, "well settled that a[n] [officer's] opening of a car trunk is a search . . . ." *United States v. Ludwig*, 641 F.3d 1243, 1250 (10th Cir. 2011).

However, one exception to the warrant and probable cause requirements is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent must be "freely and voluntarily given," which is a question of fact and is determined from the totality of the circumstances. *Id.* at 222, 227. Consent must result from the individual's free and unconstrained choice, i.e., the right to say yes or no, and not "mere submission to a claim of lawful authority," such that a reasonable person would believe they were not free to decline the officer's requests. *Royer*, 460 U.S. at 497; *United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004). For consent to be valid, two conditions must be met: (1) the consent must be "unequivocal and specific" and "freely and intelligently given"; and (2) the consent was provided without implied or express duress or coercion. *United States v. Lowe*, 999 F.2d 448, 451 (10th Cir. 1993) (quoting *United States v. Price*, 925 F.2d 1268, 1270 (10th Cir. 1991)).

The standard for measuring the voluntariness, authority, and scope of the consent is objective reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). The question is whether the consenting person's conduct would cause a reasonable person to believe permission has been given. *Id.* In making this determination, the court looks at the

consenting individual's characteristics and the environment and circumstances in which the consent was given. *Schneckloth*, 412 U.S. at 226.

Another exception to the warrant requirement is the automobile exception, which permits law enforcement officers who have "probable cause to believe a car contains contraband [to] search the car without first obtaining a search warrant." *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007); *see also California v. Carney*, 471 U.S. 386, 392 (1985). Once the officer's suspicions rise to the level of probable cause, they are empowered to search "the entire vehicle, including the trunk and all containers therein that might contain contraband." *United States v. Bradford*, 423 F.3d 1149, 1160 (10th Cir. 2005).

"The test for probable cause is not reducible to 'precise definition or quantification.'" *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "Probable cause to search a vehicle exists if, under the totality of the circumstances, a fair probability exists that 'the vehicle contains contraband or other evidence which is subject to seizure under the law.'" *United States v. Stephenson*, 452 F.3d 1173, 1177 (10th Cir. 2006) (quoting *United States v. Mercado*, 307 F.3d 1226, 1230 (10th Cir. 2002)). It exists "where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

"[T]he smell of burnt marijuana emanating from a vehicle provides probable cause to search the passenger compartment of that vehicle," but does not, standing alone, establish probable cause to search the trunk. *United States v. Wald*, 216 F.3d 1222, 1226 (10th Cir. 2000) ("[T]he smell of burnt marijuana is indicative of drug usage, rather than

drug trafficking, and . . . it is unreasonable to believe people smoke marijuana in the trunks of cars . . . ."); *Bradford*, 423 F.3d at 1160.

### 2.   Analysis

As a preliminary matter, the Court determines Plaintiffs had a reasonable expectation of privacy in the vehicle, including the interior and trunk—even though the vehicle was borrowed from Consweyla's son—and that Deputy Rael infringed upon these areas. Therefore, as it is undisputed that Deputy Rael did not have a warrant to conduct the initial search of the interior and trunk of Plaintiffs' vehicle, at issue is whether an exception applies.

First, the Court determines that Plaintiffs have not met their burden to establish that a reasonable jury could find facts supporting a violation of Plaintiffs' Fourth Amendment rights based on a search of the interior of the vehicle. Rather, the facts presented demonstrate Deputy Rael acquired probable cause to search the interior of the vehicle as permitted by the automobile exception based on his observation of a marijuana odor emanating from the vehicle. *Wald*, 216 F.3d at 1226.

In question, then, is whether Deputy Rael was justified in searching the vehicle's trunk based on consent. Viewing the facts in the light most favorable to Plaintiffs and, where applicable, in the light depicted by the video evidence, the Court concludes there is evidence in the record from which a reasonable jury could find that Consweyla did not provide consent for Deputy Rael to search the trunk of the vehicle and that Deputy Rael did so in violation of the Fourth Amendment.

As an initial matter, Deputy Rael only *explicitly asked* once for permission to search the vehicle, which occurred when Plaintiffs were still inside the vehicle. ECF No. 63-1 at

6, ¶ 27; 9, ¶ 17. He followed up his inquiry for permission to search by telling Consweyla if she said no, he would search the vehicle anyways. *Id*. Consweyla responded by telling Deputy Rael to call her son and ask him for permission because he owned the vehicle. *Id*. Deputy Rael did not call her son, instead saying he had probable cause and would search it. *Id*.

A reasonable person would not interpret Consweyla's response to Deputy Rael's direct inquiry for permission to search as unequivocal and specific consent. This is particularly true here, where the officer claimed he could search irrespective of consent or cooperation. *See, e.g.*, *Eidson v. Owens*, 515 F.3d 1139, 1146–47 (10th Cir. 2008); *United States v. Sawyer*, 441 F.3d 890, 897 (10th Cir. 2006). Indeed, Defendants do not advocate that this response constituted unequivocal consent. *See* ECF No. 75 at 4. Instead, Deputy Rael relies on the fact that Consweyla willingly handed the keys to him after he requested them as affirmation that she consented to a search of the vehicle's trunk. *Id*.

However, a reasonable jury could find that in handing the vehicle keys to Deputy Rael, Consweyla did not consent to a search of the vehicle based on the following facts: (1) Consweyla was seized on the side of a busy interstate; (2) she was in the presence of two officers; (3) she already declined to consent to a search of the vehicle; (4) she was told by Deputy Rael he would search the vehicle anyways; (5) she was never explicitly asked if she would consent to a search of the vehicle when Deputy Rael requested the keys; (6) she was not provided an opportunity to decline to provide the keys to Deputy Rael; and (7) there was no reason to believe Yahaven's shoes were in the trunk. Rather,

a reasonable jury could determine either that she was unaware she was responding to a request to search or that she simply acquiesced to a claim of lawful authority.

Importantly, it is clearly established that compliance with an officer's request, when a reasonable person would not believe they were free to decline, does not constitute consent. *United States v. Rosborough*, 366 F.3d 1145, 1149 (10th Cir. 2004) ("Whether consent was coerced depends on 'whether the officer's conduct constituted a coercive show of authority, such that a reasonable person would believe he was not free to decline the officer's requests or otherwise terminate the encounter.'"); *United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir. 1993) ("An officer's request for consent to search does not taint an otherwise consensual encounter 'as long as the police do not convey a message that compliance with their request is required.'").

The Supreme Court has repeatedly declared that when an officer "seeks to rely upon consent to justify the lawfulness of a search, [the officer] has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968); *see also Royer*, 460 U.S. at 497; *Schneckloth*, 412 U.S. at 233. For example, in *Amos v. United States*, the Supreme Court determined that when internal revenue officers came to an individual's home and stated that they "had come to search the premises 'for violations of the revenue law,'" the officers were "demanding admission to make search of [the individual's home] under government authority" and that subsequent compliance did not constitute consent to search. 255 U.S. 313, 315, 317 (1921). And, in *Johnson v. United States*, the Supreme Court deemed that an individual's compliance with an officer's demands to search was "granted in

31

submission to authority," where an officer stated, "I want you to consider yourself under arrest because we are going to search the room." 333 U.S. 10, 12–13 (1948). More recently, in *Kaupp v. Texas*, the Supreme Court found that an individual stating, "okay," in response to a group of police officers asserting, "we need to go and talk," was nothing more than "a mere submission to a claim of lawful authority." 538 U.S. 626, 631 (2003) (quoting *Royer*, 460 U.S. at 497).

Moreover, the Tenth Circuit in *Villano v. United States* put Deputy Rael more keenly on notice that an officer's request for an individual's keys and subsequent compliance by the individual does not constitute consent to search what the keys unlock. 310 F.2d 680 (10th Cir. 1962). In *Villano*, members of the Denver police department sought entry and were admitted into Paul Villano's ("Mr. Villano") home. *Id.* at 681. Upon being admitted to the home, the officers ordered Mr. Villano to get dressed and to accompany them for questioning. *Id.* Mr. Villano protested but did as the police ordered. *Id.* The officers then told Mr. Villano to bring with him the keys to his place of employment, a TV store. *Id.* When he replied that he did not have them, he was told: "Well, we have to get them; we are going to break in anyway." *Id.* Mr. Villano and the officers then drove to the home of a third person, where the keys were obtained, and thence to the TV store, where a search was conducted. *Id.* Based on these facts, the Tenth Circuit concluded that Mr. Villano did not consent to a search of the TV store. *Id.* at 684. Rather, entry to the store using Mr. Villano's keys was made under "shadow of the badge"—i.e., the officers requested the keys, and Mr. Villano acquiesced to a claim of lawful authority. *Id.*

Although the facts of every case are necessarily different,[9] the facts at issue here are "materially similar" to those in *Villano*. First, like in *Villano*, Plaintiffs were told that a search would be conducted irrespective of Plaintiffs' consent or cooperation. *Compare* ECF No. 63-1 at 6, ¶ 27; 9, ¶ 17 ("Defendant Rael asked me if he could search my car and told me that if I said no, he would search it anyway.") *with Villano*, 310 F.2d at 681 ("[W]hen [Mr. Villano] replied that he did not have [the keys, he] was then told: 'Well, we have to get them; we are going to break in anyway.'"). Second, Plaintiffs were also resistant from the start. *Compare* ECF No. 63-1 at 6, ¶ 27; 9, ¶ 17 ("I told him to call my son and ask him since it was his car.") *with Villano*, 310 F.2d at 681 ("[Mr. Villano] protested but did as the police ordered."). Last, Plaintiffs were similarly not explicitly asked for permission to search what the keys unlocked but only to provide the keys without an opportunity to decline to do so. *Compare* ECF No. 50-1 at 2, ¶ 13 ("I *requested* the keys from Consweyla . . . .") (emphasis added) *with Villano*, 310 F.2d at 681 ("[Mr. Villano] was then *told* to bring the keys . . . .") (emphasis added).

Other "materially similar" Tenth Circuit cases likewise notified Deputy Rael that acquiescing to an officer's request or command does not constitute consent to search. *See, e.g.*, *Franz v. Lytle*, 997 F.2d 784, 787–86 n.7, 792 (10th Cir. 1993) (no consent to search of home and child's body for evidence of criminal sexual abuse where officers

---

[9] "Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. The Supreme Court's obsession with the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day [] work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that [] officers are endeavoring to parse opinions." *Manzanares v. Roosevelt Cnty. Adult Detention Ctr.*, 331 F. Supp. 3d 1260, 1294 n.10 (D.N.M. 2018) (Browning, J.) (internal citation omitted).

went to parents' home to request to see their child and stated they could place the child in protective custody and "take her there ourselves" if parents did not voluntarily take the child to a hospital for examination); *United States v. Rodriguez*, 525 F.2d 1313, 1315–16 (10th Cir. 1975) (no consent to search where passengers on bus were "'told' to open their suitcases for an inspection" by border patrol agents who boarded bus and complied).

Further, the weight of authority of the other circuits establishes that compliance with an officer's request or command does not constitute consent to search. *See, e.g., United States v. Branch*, 545 F.2d 177, 181, 184 n.12 (D.C. Cir. 1976) (consent to search involuntary and "produced by the officer's claim of authority and intent to search" where officer told individual that he would be searched and, if narcotics were found, arrested and in response individual dropped his head, exclaimed "I'm busted!" and let bag drop to the floor); *United States v. Ruiz-Estrella*, 481 F.2d 723, 724–25, 728 (2d Cir. 1973) (consent to search involuntary and "acquiescence to apparent lawful authority" where federal sky marshal either requested or told individual "he would have to go through a baggage search" and individual silently handed over bag); *United States v. Robertson*, 736 F.3d 677, 679, 680–81 (4th Cir. 2013) (consent to search involuntary and individual "merely surrendered to a police officer's command" where police officer waved individual forward in order to search him, while simultaneously asking to conduct the search, and in response individual stood up, walked two yards towards officer, turned around, and raised his hands); *United States v. Bautista*, 362 F.3d 584, 587–88, 591 (9th Cir. 2004) (consent to search involuntary and in response to a police command where individual opened door to hotel room and let officers in after officers stated "San Diego police. Open the door," and placed foot on edge of door to hold it open); *United States v. Windsor*, 846 F.2d 1569,

1571 (9th Cir. 1988) (consent to search involuntary and instead "[c]ompliance with a police 'demand'" where officers went from room to room in hotel looking for suspect and with their guns drawn, knocked on each door and announced: "Police. Open the door."); *United States v. Tovar-Rico*, 61 F.3d 1529, 1535–36 (11th Cir. 1995) (consent to search involuntary and individual opened apartment door in response to a "show of official authority" where at least five officers knocked loudly at her door, announced their identity as police officers through the closed door, requested to enter, conducted a protective sweep and thereafter asked permission to search the entire apartment again).

Most parallel, in *United States v. Shepherd*, Federal Agent Aubrey Huffman ("Agent Huffman") asked Buel Lee Shepherd ("Mr. Shepherd") for his vehicle keys and thereafter searched Mr. Shepherd's vehicle, including the trunk. 714 F.2d 316, 317, 318 n.2 (4th Cir. 1983). In determining that this interaction did not produce consent to search, the Fourth Circuit pertinently stated:

> The government also maintains that Shepherd consented to the search since he voluntarily relinquished the key at Agent Huffman's request. However, there is no evidence that Shepherd's consent was obtained. The officer asked for Shepherd's key, not for permission to search the trunk. [Other officers] agreed in their testimony that no consent had been obtained. Moreover, obeying a polite request issued by someone obviously in authority and capable of enforcing the request does not amount to "consent" to the request. Citizens may obey police commands, even those put in the form of polite requests (e.g., "please raise your hands above your head"; "*please give me your keys*"), without any derivation from such non-volitional acts of a conclusion that they have waived their constitutional rights.

*Id.* at 318 n.2 (emphasis added).

In sum, a reasonable jury could find facts to conclude that Deputy Rael conducted a search of the trunk of Plaintiffs' vehicle without consent and that Deputy Rael's actions were thus unlawful in light of clearly established law. Therefore, Plaintiffs have met their burden for defeating both prongs of the qualified immunity analysis as to the search of the trunk.

Accordingly, Deputy Rael is granted qualified immunity with respect to the search of the *vehicle's interior* prior to the use of the drug-sniffing dog but is denied qualified immunity with respect to the search of the *trunk* prior to the use of the drug-sniffing dog.

### D. Whether the search of the interior and trunk of Plaintiffs' vehicle by Deputy Rael after the use of the drug-sniffing dog was proper.

As to the second search of the vehicle by Deputy Rael after the use of the drug-sniffing dog, Defendants argue Deputy Rael developed probable cause to search the interior and trunk of the vehicle. ECF No. 50 at 8. Upon his first encounter with Cynthia, Deputy Rael noticed the smell of marijuana coming from the vehicle. *Id.* Due to his reasonable suspicion that marijuana might have been in the vehicle, Deputy Rael asked Plaintiffs to exit the vehicle so that he could conduct a dog sniff of the exterior of the vehicle for contraband using his drug dog. *Id.* The drug dog alerted Deputy Rael to an odor of contraband near the trunk of the vehicle. *Id.* Due to the smell of marijuana emanating from the vehicle, accompanied by the drug dog alerting at the trunk of the vehicle, Deputy Rael claims he had probable cause to search the interior and trunk of the vehicle. *Id.* He further contends the 25-minute search was not unreasonable, after which Deputy Rael concluded his investigation. *Id.* Plaintiffs challenge the constitutionality of the search of Plaintiffs' vehicle, including the interior and trunk, after Deputy Rael conducted

a dog sniff around the vehicle. *See* ECF No. 63 at 12. The Court notes that the dashboard camera footage entirely captured this second search.

### 1.  Applicable Law

Although probable cause is needed to search the interior of a vehicle pursuant to the automobile exception, probable cause is not required to conduct a dog sniff of the vehicle's exterior. *Ludwig,* 10 F.3d at 1527–28. If a certified drug dog gives a positive alert, this typically provides probable cause for officers to search a vehicle, including the trunk, if the dog alerts to it. *Id.* Officers may not, however, rely on a dog's alert if they open part of the vehicle so the dog can enter or if they encourage the dog to enter. *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 880 (10th Cir. 2014).

### 2.  Analysis

Again, it is undisputed that Deputy Rael did not have a warrant to conduct the second search of the interior and trunk of Plaintiffs' vehicle after using the drug-sniffing dog; at issue is whether an exception to the warrant requirement applies.

As stated previously, the Court determines that Plaintiffs have not met their burden to establish that a reasonable jury could find facts supporting a violation of Plaintiffs' Fourth Amendment rights based on a search of the interior of the vehicle. Rather, the facts presented demonstrate Deputy Rael acquired probable cause to search the interior of the vehicle, as permitted by the automobile exception, based on his observation of a marijuana odor emanating from the vehicle. *Wald*, 216 F.3d at 1226.

Under consideration, then, is whether Deputy Rael was justified, pursuant to the automobile exception, in searching the vehicle's trunk during this second search. Viewing the facts in the light depicted by the video evidence, the Court concludes there is evidence

in the record from which a reasonable jury could find that Deputy Rael facilitated the drug-sniffing dog's entry into Plaintiffs' trunk without first establishing probable cause in violation of the Fourth Amendment.

Deputy Rael justifies the second search of the trunk based on the drug-sniffing dog's alert to the odor of contraband in the vehicle near the trunk. ECF No. 50 at 8. Typically, a certified drug-sniffing dog's "alert" to the *closed* trunk of a vehicle indicating the presence of illegal drugs provides probable cause to search the trunk. *Ludwig,* 10 F.3d at 1527–28. However, it is clearly established "that officers cannot rely on a dog's alert to establish probable cause if the officers *open part of the vehicle* so the dog may enter the vehicle or otherwise facilitate its entry." *Felders*, 755 F.3d at 880 (emphasis added).

As found previously, a reasonable jury could conclude that Deputy Rael had neither consent nor probable cause to search the trunk prior to the use of the drug-sniffing dog. When Deputy Rael conducted the dog sniff, the trunk was still left open from when he had conducted the first—possibly unconstitutional—search of the trunk. ECF No. 37-1, Ex. A-2 at 0:04:10–0:05:28; ECF No. 37-1, Ex. A-3 at 0:00:01–0:00:03; *see also* ECF No. 50-1 at 2, ¶ 14; ECF No. 63-1 at 6, ¶ 29; 9, ¶ 19. During the dog sniff, the dashboard camera footage depicts the dog partially entering the interior of the trunk. ECF No. 37-1, Ex. A-2 at 0:04:10–0:05:28; ECF No. 37-1, Ex. A-3 at 0:00:01–0:00:03; *see also* ECF No. 50-1 at 2, ¶ 14; ECF No. 63-1 at 6, ¶ 29; 9, ¶ 19.

Like in *Felders*, "where there is evidence that it is not the driver but the officers who have 'create[d] the opportunity for a drug dog to go where the officer himself cannot go,' the Fourth Amendment protects the driver's right to privacy . . . ." 755 F.3d at 880.

Here, as discussed above, a reasonable jury could find facts to support that Deputy Rael never had proper legal justification to look through or keep open the trunk of Plaintiffs' vehicle in the first search. Then, in keeping the trunk open even after obtaining Yahaven's shoes, Deputy Rael facilitated the dog's entry into the trunk where there was no probable cause to enter. Thereafter, he relied on the dog's alert of the trunk after the dog partially entered the trunk to justify the second search of the trunk.

In sum, a reasonable jury could find facts to conclude that Deputy Rael facilitated the drug-sniffing dog's entry into Plaintiffs' trunk without first establishing probable cause in violation of the Fourth Amendment and that Deputy Rael's actions were unlawful in light of clearly established law. Thus, Plaintiffs have met their burden for defeating both prongs of the qualified immunity analysis as to the search of the trunk.

Accordingly, Deputy Rael is granted qualified immunity with respect to the search of the *vehicle's interior* after the use of the drug-sniffing dog but is denied qualified immunity with respect to the search of the *trunk* after the use of the drug-sniffing dog.

### E. Whether Deputy Armijo can be held liable.

Next, Defendants contest Deputy Armijo's liability. Defendants argue Deputy Armijo was not involved in the initial stop, and thus he cannot be liable due to his lack of personal involvement. ECF No. 50 at 9. Defendants contend that once he came to assist, Deputy Armijo reasonably relied on Deputy Rael's articulable reasonable suspicion to deploy the canine based on the smell of marijuana. *Id.* Further, Defendants assert that Cynthia admitted marijuana use to Deputy Armijo, providing a separate basis for him to independently develop probable cause when coupled with the canine alert, all of which occurred prior to Deputy Armijo assisting with the actual search. *Id.*

As an initial matter, Deputy Armijo does not provide an affidavit or declaration, nor does Deputy Rael's declaration articulate what he specifically advised Deputy Armijo before he arrived on the scene. *See generally* ECF No. 50-1. Rather, the Court must rely on the dashboard camera footage to determine Deputy Armijo's liability and what, if any, information was shared between the officers.

With respect to the initial stop of Plaintiffs by Deputy Rael, the Court agrees that Deputy Armijo was not personally involved and, therefore, cannot be held responsible. *See Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) ("Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation."). With respect to the investigatory detention of Plaintiffs to conduct a drug-dog sniff of their vehicle, to the extent Deputy Armijo facilitated the prolonged detention, the Court has already determined that a reasonable jury could find that there was reasonable suspicion to detain Plaintiffs to deploy the drug-sniffing dog, and thus, there was no Fourth Amendment violation.

Regarding the searches of Plaintiffs' vehicle, Deputy Armijo only participated in the search of the vehicle's interior after the use of the drug-sniffing dog. Despite their broad assertions, Defendants do not put forth evidence of any statements made between Deputy Rael and Deputy Armijo to support a "good faith" defense, "which shields objectively reasonable good faith reliance on the statements of a fellow officer, but does not protect deliberate, reckless, or grossly negligent reliance on the flawed conclusions of a fellow officer." *Felders*, 755 F.3d at 882. Nor does the dashboard footage contain any such conversations between the two officers to support this defense. Additionally, Deputy

Armijo cannot rely on the drug-sniffing dog's alert as the dog alerted to the trunk, not the interior, and, further, the Court has already deemed reliance on the alert problematic.

Notwithstanding the above, the facts demonstrate that Deputy Armijo independently developed probable cause to search the interior based on comments made by Cynthia, *see United States v. Gary*, 24 F. App'x 862, 865 (10th Cir. 2001), including that she smokes marijuana "every now and then," ECF No. 37-1, Ex. A-4 at 0:01:10–0:01:15, and when Deputy Armijo stated, "So probably what the dog alerted to is the odor or residue of weed, if — if you did smoke it," she replied, "Yeah, it was some blunt roaches," *id.* at 0:03:10–0:03:18; *see also* ECF No. 50-1 at 2, ¶ 17.

Accordingly, Deputy Armijo is granted qualified immunity as to the entirety of Plaintiffs' Fourth Amendment claim.

### F.  Whether Sheriff Gonzales and the County can be held liable.

Finally, Defendants argue there can be no supervisory liability or municipal liability for Defendant Sheriff Manuel Gonzales ("Sheriff Gonzales") of the Bernalillo County Sheriff's Department or Defendant Bernalillo County Board of Commissioners ("County") without an underlying constitutional violation. ECF No. 50 at 9. Indeed, a supervisor or municipality cannot be held liable where there is no underlying constitutional violation. *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008); *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006). As the Court concludes that Plaintiffs have not met their burden to establish that a reasonable jury could find facts supporting a violation of Plaintiffs' Fourth Amendment rights with respect to the initial stop, investigatory detention, and search of the interior of the vehicle prior to and after the use of the drug-sniffing dog, the Court will grant summary judgment in favor of Sheriff Gonzales and the County as to

the aforementioned. However, the Court finds that Plaintiffs have met their burden with respect to the search of the trunk prior to and after the use of the drug-sniffing dog, and as Defendants make no other arguments for dismissal of these two Defendants, the Court denies summary judgment to Sheriff Gonzales and the County as to those searches.

**CONCLUSION**

For the foregoing reasons, "Motion for Summary Judgment Dismissing Count I on Basis of Qualified Immunity" [ECF No. 50] is hereby **GRANTED IN PART** and **DENIED IN PART**, as follows:

1. It is **HEREBY ORDERED** that summary judgment on Count I is **GRANTED** in favor of Deputy Rael with respect to the initial stop, investigatory detention, and searches of the interior of Plaintiffs' vehicle prior to and after the use of the drug-sniffing dog.

2. It is **FURTHER ORDERED** that summary judgment on Count I is **DENIED** to Deputy Rael with respect to the searches of the trunk of Plaintiffs' vehicle prior to and after the use of the drug-sniffing dog.

3. It is **FURTHER ORDERED** that summary judgment on Count I is **GRANTED** in favor of Deputy Armijo with respect to Count I in its entirety.

4. It is **FURTHER ORDERED** that summary judgment on Count I is **GRANTED** in favor of Sheriff Gonzales with respect to the initial stop, investigatory detention, and searches of the interior of Plaintiffs' vehicle prior to and after the use of the drug-sniffing dog.

5. It is **FURTHER ORDERED** that summary judgment on Count I is **DENIED** to Sheriff Gonzales with respect to the searches of the trunk of Plaintiffs' vehicle prior to and after the use of the drug-sniffing dog.

6. It is **FURTHER ORDERED** that summary judgment on Count I is **GRANTED** in favor of the County with respect to the initial stop, investigatory detention, and searches of the interior of Plaintiffs' vehicle prior to and after the use of the drug-sniffing dog.

7. It is **FURTHER ORDERED** that summary judgment on Count I is **DENIED** to the County with respect to the searches of the trunk of Plaintiffs' vehicle prior to and after the use of the drug-sniffing dog.

**MARGARET STRICKLAND**
UNITED STATES DISTRICT JUDGE